HALL (CAPELLE v.). See Case No. 2,391.

## Case No. 5,928.

HALL et al. v. COOLEY et al.

[3 N. Y. Leg. Obs. (1845) 282.]

District Court, N. D. New York.

BANKRUPTCY—LIVERY STABLE KEEPER—TRADING.

1. Livery stable keepers, as such, are not liable to be proceeded against on the petition of creditors, under the late bankrupt act [of 1841 (5 Stat. 440)], as "persons being merchants, or using the trade of merchandize, or retailers of merchandize."

[Cited in Re Smith, Case No. 12,981.]

2. The owner of timber lands who cuts down his trees and manufactures them into lumber for sale, merely as a means of deriving profit for his real estate, as such, does not thereby constitute himself a merchant or trader within the act. But if he carries on this business upon a large scale, substantially and independently as a trade, the course of decision in the English courts strongly favors the conclusion that this would be sufficient to bring him within the act; and if it further appears that he has from time to time bought timber lands, for the express purpose of manufacturing, and does manufacture lumber from the trees growing thereon, for sale, and in one instance erected a saw-mill on the land purchased, and in another instance, in connection with the purchase of timber land, also purchased a large lot of sawed lumber for sale; the case is clear.

This was a petition for a compulsory decree of bankruptcy, and came before the court for hearing on the petition, answer and depositions. Several other questions arising in the case, having already, in the earlier stages of the controversy, been disposed of, the main, and in fact the only contested question now was, whether the respondents were "merchants, or persons using the trade of merchandize, or retailers of merchandize," in the sense in which these terms are used in the first section of the bankrupt act.

The state of the case with respect to this question was substantially as follows: The petitioners [Samuel Hall and others] allege that the respondents [Levi J. Cooley and Samuel H. Maxwell], at the time of committing the several acts of bankruptcy charged against them, (the most important of which was committed on the 4th of January, 1843,) were "lumber merchants, and using the trade of purchasing lumber and logs, and manufacturing, shipping and selling lumber at wholesale and retail," and that they were "engaged in the purchase and exchange of horses and carriages and in the purchase of hay and provender, in the keeping of said horses, and in letting horses and carriages for hire." The respondents in their answer admit that on the 4th of January, 1843, and for more than a year previous thereto, they "were the owners of a certain saw-mill with the appurtenances, and were interested as owners in certain timber lands in the town of Caton, Steuben county, upon which lands said mill was situated, and were interested as part owners of two other saw mills in Jackson, Tioga county, Pennsylvania, and in about three hundred and fifty acres of timber land, upon a part of which said saw-mills are situate." And they further admit that they cut down trees on these lands, and, at their mills, manufactured the logs into lumber, to the extent of about 400,000 feet; of which they shipped and sold at wholesale about 250,000, and sold the residue at retail at Elmira, where they resided and kept a lumber yard. And they deny that they were in any other manner lumber merchants.

The respondents in their answer further admit that on the said fourth day of January, 1843, and for more than a year previous thereto, they were the "owners of several horses and carriages which were kept by them and let by them for hire; that when a horse or carriage became worn out or otherwise rendered unfit for use, they sold and disposed of the said horse or carriage, or exchanged the same for a horse fit for use in their said business; and that they occasionally purchased a horse, or a pair of horses and carriage, to use in said business and let to hire." And they deny that they in any other manner were dealers in horses or carriages.

The depositions show that "in the spring of 1841, the respondents and one James Miller, purchased of one Shepherd some timber land with a saw-mill thereon, together with over 100,000 feet of pine boards and plank. This was called the 'Chidesder Mill.'" They afterwards became interested jointly with Miller in two other saw-mills on the same stream, one called "Frind's Mill," and the other "Mitchell's Mill." These mills were managed and worked by Miller. The business consisted in sawing logs cut on the land bought of Shepherd, and in custom work. The witness Stowel who run the Chidesder mill testifies that Miller sometimes bought lumber of customers after it was sawed. The testimony further shows that in the fall of 1841 the respondents bought a lot of timber land with a steam saw mill thereon in

the town of Elmira; that after keeping the mill in operation at Elmira from October, 1841, to March, 1842, they removed it to the town of Caton in the county of Steuben, and there set it up in June or July, 1842, and put it in operation in September of that year.

The evidence in regard to the business of the respondents as livery stable keepers is in substantial accordance with their answer, except that one of the witnesses swears to the sale of several horses; which in his opinion were fit for their business as livery stable keepers; one of which he states was sold soon after it was purchased, at an advance of thirty dollars. The amount of capital employed in this business was about $4,000, and they usually had on hand from 15 to 20 horses, and from 12 to 15 carriages of various descriptions. It is further shown by the evidence that previous to June, 1841, they were extensively concerned in contracts for the transportation of the mail, and received from the government about $10,000 a year for this service. For the purpose of carrying on this business, and that of conveying passengers, they kept a large additional number of horses—about 80 in all. Their stage business ceased, except as to one route, in June, 1841. At that time they had a large quantity of oats on hand, which they sold, and had a sign up inviting purchasers. Oats were at that time dear; after harvest, when oats were cheap, they began again to purchase for their livery horses. In the prosecution of their business as stage proprietors and livery stable keepers, they were obliged to purchase large quantities of hay and oats, for which they sometimes paid cash, and at other times gave their notes payable at a future day. Between the 24th of February, 1838, and the 31st of December, 1842, the respondents obtained loans, on accommodation notes, from the Chemung Canal Bank, amounting in the aggregate to $21,241.

P. G. Clark, for petitioners.
W. H. Seward, for respondents.

CONKLING, District Judge. The case turns upon the question whether the respondents, at the date of the several acts of bankruptcy charged against them, were, in the language of the late bankrupt act, "persons being merchants, or using the trade of merchandize, or retailers of merchandize." Looking in a general and summary way at their extensive and diversified business, and the manner in which it was conducted, it is difficult for a mind familiar with the policy of the compulsory provisions of the act, to resist the conviction that it was at least intended to embrace cases like this. But whether it does so in fact, is a question juris positivi, and depends upon the just construction of the terms of the act. The policy of the compulsory branch of the American act is in accordance with that of the correspondent provisions of the English bank-

rupt laws. The preamble of the first English bankrupt statute (34 Wm. VIII. c. 4) recites that, "divers persons craftily obtaining into their hands great substance of other men's goods, do suddenly fly to parts unknown, or keep their houses, not minding to pay or restore to any of their creditors, their debts and duties, but at their own wills and pleasures consume their substance obtained by credit of other men." The statute of 21 Jac. I., c. 19, (differing in this respect but little from other intermediate acts,) provides that all persons who "use the trade of merchandize by way of bargaining, exchange, bartry, chevizance, or otherwise in gross or by retail, or seeking his, her, or their trade of living by buying and selling, upon committing acts of bankruptcy, shall be accounted and adjudged bankrupts." The first of these extracts from the English bankrupt act indicates their principle; the second, (so far the largest class of persons embraced by them, and so far as the present questions are concerned,) defines their scope. In this court, and, it is believed also, in the other national courts, the decisions of the English courts illustrative of this principle, and tending to show who are to be considered as belonging to the denomination of persons who "use the trade of merchandize," have been regarded as applicable to cases of this character arising under our own act. To this test, therefore, I propose to subject the present case.

1. Prior to the act of 6 Geo. IV., c. 16, (passed in 1825,) by which the scope of the antecedent acts, interpreted by the courts, was defined and to some extent enlarged, and which, in addition to those embraced in the previous acts, designates "persons who seek their living by buying and letting for hire," livery stable keepers as such, do not appear ever to have been considered subject to such liability. It was only by adjudging them to be persons "using the trade of merchandize," or, as such persons are usually styled in the English courts, "traders," that they could have been brought within the earlier acts. But to constitute a trader, selling as well as buying was always held to be indispensable; and it was justly considered that the occasional sale of horses and carriages that had become unfit for use, was but a necessary incident to the main business of letting for hire, and did not constitute the trade of merchandize. If, therefore, they are liable to be decreed bankrupts on account of their course of dealing in the prosecution of this branch of their business, it must be on the ground of their having transcended its ordinary and just limits in selling horses and oats. But the just inference from the evidence is that their sales of horses were at most only occasional and rare, and that they did not intend to deal generally, or hold themselves out as dealers, in horses, except so far as the exigencies of their other business required. And such oc-

casional acts by persons not in a line of life to subject them to the bankrupt laws, have been held insufficient for this purpose, as being only ancillary to their main business. With respect to their sales of oats, it appears that these oats had been purchased by them to be consumed in the prosecution of their business as stage proprietors and mail contractors, and that the sales were made in consequence of their abandonment of this business; and it has repeatedly been decided in the English courts that a sale of surplus commodities not purchased with a view to sale, was not such a dealing as would render the vendor liable to prosecution as a bankrupt. The fact relied on by the counsel for the petitioners of the respondents having been obliged to purchase oats again after harvest for their livery horses, I am of opinion ought to make no difference. At the time of the sale they had a large surplus, and they had a right to dispose of it. That they were able then to obtain a high price, and afterwards to purchase at a lower rate was but a fortunate accident. Upon the whole, therefore, my opinion is that the respondents are not liable to be decreed bankrupts in this compulsory proceeding, as dealers in horses, carriages or provender.

To prevent misapprehension, it may not be amiss to notice the case of Martin v. Nightingale, 3 Bing. 421, cited and relied on at the argument by the counsel for the petitioners, in which a livery stable keeper was subjected in the bankrupt law. This case was decided in 1826, which was the next year after the passage of the act of Geo. IV., already referred to. The only report of it I have it in my power to consult, is a mere statement of the point decided, in 17 C. L. 33. Neither from this imperfect report, nor from the citations of the case I have met with in elementary works, does it satisfactorily appear what were the precise grounds of the decision. But the tenor of antecedent decisions clearly infers either that this case arose after and was governed by the new act, or that it turned on the fact stated, that the party "occasionally sold horses to customers." That the provision of the act of Geo. IV., by which all those who seek their living by buying and letting for hire were subjected to its operation, was intended to bring in an additional class of persons, does not admit of a doubt. Such is unhesitatingly assumed to have been its design and effect by Mr. Sanders, in his treatise on the Law of Pleading and Evidence (volume 1, p. 218), where, speaking of this clause of the new act, he remarks that "this provision will include a large class of persons, such as job-masters, livery stable keepers, hackney-men, furniture brokers, &c.," and in support of his position he cites Deac. 27. Congress not having seen fit to adopt this provision, it is entirely clear that any decisions founded on it are inapplicable here.

2. It remains therefore to be decided, whether the respondents are liable as lumber merchants. Their liability on this ground was denied by their counsel, because, as he insisted, the lumber sold by them was manufactured from trees which had grown on their own lands. That the manufacture and sale, by a person, of the produce of his own land does not constitute such person a trader within the purview of the English bankrupt law, as a general proposition, is true. But it is a proposition subject to exceptions. "This question," says Lord Henley, (formerly Mr. Eden,) in the last edition of his Digest of the Bankrupt Law, "whether a person making bricks for sale is liable to the bankrupt law, was formerly much and most unsatisfactorily discussed. The point has since come under consideration, and the general doctrine as extracted from the modern cases, may now be stated as follows: When the business of brick-making is carried on as a mode of enjoying the profits of a real estate, it will not make the party liable to the bankrupt law; but where it is carried on substantially and independently as a trade, it will do so; and there is no difference whether the party is a termer or entitled to the freehold. The same general doctrine applies to the case of a person manufacturing alum, burning lime, or selling minerals from his own quarry."

I have carefully examined all the cases within my reach, cited by this writer on this point, and such others as I have been able to find. I abstain however from attempting a particular analysis of them, because I am of opinion that the present case does not require so elaborate an undertaking. Suffice it to say, that although there is some apparent discrepancy among them, they seem to me to warrant the inference drawn from them by Lord Henley. It will be observed he does not mention the case of the manufacture of lumber. Indeed, that case would seem to be in one respect distinguishable from most if not all of the cases mentioned by him, on the ground that in these, other materials are to be bought and mixed with the produce of the land; and in order to constitute a using of the trade of merchandize, there must be a buying of some commodity, and a selling of the same commodity, either in the same or in an altered state. But be this as it may, it cannot be doubted that the purchase of trees, whether felled or standing, and the manufacture and sale of lumber therefrom, would be equivalent to the purchase and sale of lumber already manufactured by another; nor that a lumber merchant is as much subject to the bankrupt law, as a merchant of any other description. This was distinctly decided in the case of Holroyd v. Gwynne, 2 Taunt. 176. In that case the bankrupt had purchased 347 oaks, and 11 ash trees, standing, which he converted into timber, laths, &c., a part of which he had sold. It was proved also that he attended public auctions of timber, and that he subsequently bought, but did not pay for, another parcel. The court considered it

a clear case of trading. It is true the bankrupt in that case purchased only the timber, and that in the present case the respondents purchased the lands as well as the timber growing thereon. And it is true also as a general principle that dealings in real estate do not make a man a trader. But whether the respondents can claim exemption on this ground, may well be doubted. It is the duty of courts to regard not so much the mere forms as the substance of things. The respondents were extensively engaged in the manufacture and sale of lumber. They obtained the raw material chiefly by successive purchases of timber lands, in different places, remote from the place of their residence, and which they do not appear to have used, or contemplated using, for any other purpose. It was virtually therefore by the purchase of growing trees; and if it was necessary to decide the question, I should feel much hesitation, notwithstanding the old case of Port v. Turton, 2 Wils. 169, relied on by the counsel for the respondents, in adopting the conclusion that the character of their transactions were essentially changed by the fact of their having also acquired a title to the lands, on which the timber was growing. But what in my judgment places the case beyond all reasonable doubt is the fact that they also purchased and sold lumber already sawed. To say nothing of the evidence of other purchases, they in partnership with Miller, in the spring of 1841, bought of Shepherd 100,000 feet of pine boards and plank. This purchase alone would bring them directly within the case of Holroyd v. Gwynne, and stamp them with the character of lumber merchants. Several minor purchases were also made by their partner, Miller, who had charge of the mills in which the three were jointly interested, and although it does not expressly appear that the respondents knew of these purchases at the time, yet, as Miller was their agent as well as partner, and as there is no evidence of dissent on their part, I think they are legally responsible for his acts. It was insisted also with considerable plausibility by the counsel for the petitioner, that the evidence shows a large excess of sales during the season of 1842, over the quantity of lumber manufactured, and that this excess can in no otherwise be satisfactorily accounted for, than by the supposition that considerable purchases were in fact made of which no particular account is given.

The idea that the range of inquiry as to the transactions of the respondents was by the terms of the order limited to the period of three months next preceding the 4th of January, 1843, was wholly fallacious. The nature of the respondents' occupation at that date, could be satisfactorily determined only by ascertaining what it had been during a considerable period before. If they had in fact abandoned their business as lumber merchants, they had a right to show it. But there being no such evidence, the law will presume its continuance—and indeed, the evidence clearly shows that it was continued.

Upon the whole, therefore, while I concede the general principles laid down by the counsel for the respondents, in his learned and able argument, I am of opinion that a decree of bankruptcy ought to be entered against the respondents. The strenuous and persevering opposition which has been made to this petition, under the circumstances of the case, and on the grounds assumed, would seem to infer an impression on the part of the respondents that preferences given in direct contravention of the second section of the bankrupt act, and which it expressly declares to be fraudulent and void, can be so declared only when brought directly under the cognizance of the national courts, by a proceeding either voluntary or compulsory under the act. For such an impression no sufficient color is afforded either by judicial decisions, so far as they have come to my knowledge, or by any just view of the policy of the act. The provisions to which I have referred, are in terms unlimited as to persons, and being the supreme law of the land, are obligatory alike upon the state and national courts.